319 P.3d 356

LAHAINA FASHIONS, INC., a Hawai'i corporation, Petitioner/Plaintiff–Appellant/Cross–Appellee,

v.

BANK OF HAWAI'I, a Hawai'i corporation; Hawaiian Trust Company, Ltd., as Trustee for Hawai'i Real Estate Equity Fund; Hawai'i Real Estate Equity Fund; Pacific Century Trust, a division of Bank of Hawai'i as Trustee of the Hawai'i Real Estate Equity Fund, Respondents/Defendants–Appellees/Cross–Appellants.

No. SCWC–30644.

Supreme Court of Hawai'i.

Jan. 7, 2014.

438

Philip H. Lowenthal, Benjamin Lowenthal, Wailuku, Joseph M. Alioto, and James Dombroski, Petaluma, for petitioner.

Terrence J. O'Toole, Judith A. Pavey, and Andrew J. Lautenbach, Honolulu, for respondents.

NAKAYAMA, Acting C.J., ACOBA, JR., McKENNA, and POLLACK, JJ., and Circuit Judge KIM, in place of RECKTENWALD, C.J., recused.

Opinion of the Court by ACOBA, J.

We hold, first, that depending on the circumstances, a court may recall a jury following a formal discharge if the jury is in the presence of, under the direction of, or subject to the control of the court. Inasmuch as the Intermediate Court of Appeals (ICA) held that a jury cannot be recalled under any circumstances following an order discharging the jury, respectfully, the ICA erred.

Second, a special verdict form cannot be amended simply because the jury "realized that its answers to the special verdict form have caused a result opposite from what it intended," or misunderstood the legal effect of its answer to a special verdict question. *Cabral v. McBryde Sugar Co., Ltd.*, 3 Haw. App. 223, 228, 647 P.2d 1232, 1235 (1982). Thus, we hold that the jurors' statements that they "misunderstood" or "misinterpret-

ed" the legal effect of the statute of limitations question on the special verdict form in this case does not provide a basis for overturning the jury's verdict in favor of Respondents/Defendants–Appellees/Cross–Appellants Bank of Hawai'i (Bank); Hawaiian Trust Company, Ltd. (Hawaiian Trust); Hawai'i Real Estate Equity Fund; and Pacific Century Trust (collectively, Respondents) and against Petitioner/Plaintiff-Appellant/Cross-Appellee Lahaina Fashions, Inc. (Petitioner) on this ground.

Third, the question of whether the conversation of the Circuit Court of the Second Circuit (the court)[1] with the jurors after the court had initially discharged the jurors constituted an improper outside influence is moot, because the ICA correctly sustained the verdict under *Cabral.*

Finally, a contract to convey property does not create a trust relationship between the vendor and the purchaser of the property and therefore does not impose any fiduciary duties on the vendor. Restatement (Third) of Trusts (Third Restatement) § 5 cmt. I. Because the only alleged trust identified at trial by Petitioner was effectively a contract to convey property, no trust was created and therefore the ICA did not err in affirming the court's order granting Respondents' motion for Judgment as a Matter of Law (JMOL) on Petitioner's breach of fiduciary duty claim.

For the reasons set forth herein, the April 12, 2013 judgment of the ICA filed pursuant to its February 2, 2013 published opinion is affirmed in part and vacated in part, and the July 8, 2010 final judgment of the court is affirmed.

I.

A.

Until 1994, Petitioner held title to property located at 744 Front Street, Lahaina, Maui. In 1994, however, Petitioner defaulted on a § 2.5 million mortgage loan held by International Savings and Loan. As a result, Petitioner attempted to sell the Property to repay the loan.

---

1. The Honorable Joseph E. Cardoza presided.

On July 7, 1994, Petitioner agreed to sell the Property to Respondents for $6 million. As part of the Purchase and Sale Agreement, Respondents as "Landlord" agreed to lease the Property to Petitioner as "Tenant" for a period of fifty years. Under the terms of the lease, Petitioner retained the option to repurchase the Property (the Option) and sell it for a profit:

X. Option to Purchase Landlord's Interest.

10.01 Tenant's Option to Purchase. If at any time during the first ten (10) years of the Lease, Tenant desires to sell Tenant's interest in this Lease, and Landlord's interest in this Lease and the fee simple title to the Land (collectively called "leased fee interest") for the sole purpose of selling to a third party Tenant's leasehold interest and Landlord's leased fee interest (so that such third party would own the Land in fee simple), then Tenant shall give Landlord prior written notice of the terms and conditions of the proposed sale and the name of the proposed buyer. Tenant shall have the right to purchase Landlord's leased fee interest under the terms and conditions outlined below by giving Landlord written notice of Tenant's election to purchase Landlord's leased fee interest, in writing, within thirty (30) days after receipt of an offer from a prospective buyer. If Tenant exercises its right to purchase Landlord's leased fee interest, then Tenant shall pay Landlord the amount specified below within the time proposed by the specified buyer, not to exceed six (6) months after Tenant's election to purchase Landlord's leased fee interest. If the prospective buyer is affiliated with or has had a business relationship with tenant, upon request of Landlord, Tenant shall furnish proof satisfactory to Landlord that the sale is not a sham sale for the purpose of subsequent resale, to avoid the payment of the percentage price to Landlord under Section 10.02. If Tenant fails to furnish satisfactory proof, Landlord may refuse to honor the exercise of such [O]ption . . . .

10.02 Purchase Price for Landlord's Leased Fee Interest. The purchase price for Landlord's leased fee interest shall be SIX MILLION AND NO/100 DOLLARS ($6,000,000.00) plus fifty percent (50%) of the "Net Proceeds of Sale" in excess of NINE MILLION AND NO/100 DOLLARS ($9,000,000.00). As used herein, "Net Proceeds of Sale" means the Purchase Price paid by the prospective buyer less real estate brokers commissions and customary closing costs, provided that such commissions and closing costs shall not exceed four percent (4%) of such Purchase Price . . . .

(Emphases added.) The lease agreement also stated the parties had negotiated the agreement at arm's length and did not intend to form a partnership or joint venture:

9.12 No Party Deemed Drafter. All provisions of this Lease have been negotiated at arms length and with full representation of legal counsel and neither party shall be deemed the drafter of this Lease . . . .

9.13 No Partnership Intended. Landlord and Tenant hereby agree that Landlord in no event and for no purpose is a partner of Tenant in the conduct of any of its businesses or other affairs or a joint venturer or member of a joint enterprise with Tenant.

(Emphases added.)

In 1999, Petitioner could not make its rent payments under the lease agreement and consequently defaulted. Subsequently, Pacific Century Trust, a division of the Bank and one of the owners of the Property, filed suit seeking a writ of possession and damages. However, prior to the conclusion of that action, Petitioner filed for bankruptcy in the United States Bankruptcy Court. The bankruptcy court approved the sale of Petitioner's leasehold interest in the Property to Loko Maui, LLC on November 1, 2001,[2] in exchange for the payment of Petitioner's arrearage and $250,000. As a result, Pacific Century Trust's suit was dismissed.

---

**2.** The actions that form the basis of Petitioner's claims that Respondents prevented Petitioner from exercising the Option took place prior to the sale of Petitioner's leasehold interest in the

Property on November 1, 2001, while Petitioner remained a tenant of Respondents under the terms of the lease agreement.

On June 25, 2007, Petitioner filed a Complaint, initiating the instant case. The Complaint alleged that Respondents "had no intention of allowing [Petitioner] to exercise the Option," and asserted claims against Respondents for fraud, conspiracy to defraud, breach of fiduciary duty, and tortious interference with prospective business advantage.

### B.

At trial, George Weir (Weir), the Bank's senior executive officer at the time it entered the agreement with Petitioner, testified as to whether Respondents owed Petitioner any fiduciary duties:

Q. [by Petitioner] All right. So if the [O]ption is exercised, you'd have to give clear title, wouldn't you?

A. [by Weir] Of course.

. . . .

Q. You have to hold it in effect for [Petitioner's] benefit, if they exercise the [O]ption?

A. At the time—if they were to exercise their [O]ption and we were to accept it, at close of escrow, we'd have to deliver clean title.

Q. So you have an obligation to [Petitioner] to make sure that . . . if the [O]ption is in fact exercised, you're going to give him clear title?

A. At close of escrow, yes, sir.

Q. So in effect then, [Petitioner] would be a beneficiary and you would have the obligation to make sure nothing happens to the land if the [O]ption is closed?

A. At the time of the close of escrow we'd have to deliver it clear, as I say.

. . . .

Q. So you have an obligation to make sure that either nothing happens or if something does, you've got to fix it?

A. True.

. . . .

Q. Okay. Now, would you say that that puts you in a fiduciary relationship with them?

A. It's a stretch. I'll take that.

Q. You'll accept that?

A. A definition of a fiduciary is one who has a confidential relationship with another, which could extend to husband and wife. So sure.

(Emphases added.) Weir later clarified his testimony on cross-examination:

Q. [by Respondents] What did you mean by your statement [that you owed a fiduciary duty to Petitioner]?

A. [by Weir] Well, the—I don't know. I guess you—there's fiduciary with a little "F" and fiduciary with a big "F."

In my business, it is—we have a—as I mentioned earlier, we have a statutory law, a legal responsibility as a fiduciary as well as a common law, you know, tradition, responsibility toward our trust beneficiaries.

When I said it was a stretch, you know, you have an obligation. I suppose you could call it a fiduciary duty. When you enter into a contract with someone, you have an obligation, legal obligation or moral obligation, honesty, fair play between two parties who enter into an agreement. That's just the way we work. That's the way we all work.

But as far as the true fiduciary duty, my true fiduciary duty—and that's, again, with a big "F"—to those participants in that fund, our client, our beneficiaries, and that obligation under the contract to deal fairly and honestly with Mr. Takeuchi,[3] certainly.

(Emphases added.)

Following the conclusion of Petitioner's case in chief, Respondents moved for JMOL, arguing *inter alia* that "no fiduciary duty was owed to [Petitioners]" by Respondents. The court granted Respondents' JMOL on this claim.

The jury was asked to render a special verdict on Petitioner's remaining claims. As to the fraud in the inducement and conspiracy to defraud claims, the jury found that Petitioner had failed to prove its case by clear and convincing evidence.

But, on the tortious interference claim, the jury found that Petitioner had met its burden

---

**3.** "Mr. Takeuchi" refers to George Takeuchi, the manager of Petitioner.

of proving each of the four elements of its claim. The jury therefore awarded Petitioner $680,000.00 in general damages and $770,821.00 in punitive damages. However, Question 7 on the special verdict form read:

> [Petitioner] initiated this lawsuit on June 25, 2007. Did [Respondents] meet their burden of proof by a preponderance of the evidence that [Petitioner] was either aware of its interference claim or had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the interference two or more years prior to June 25, 2007?

(Emphases added.) The jury answered "Yes" to Question 7.

The verdict was read in open court on June 10, 2009. The jury was polled, and eleven of the twelve jurors stated that they agreed with "all of the answers read into the record."

Following the entry of the verdict, the court informed the jurors that they were discharged:

> After you have been discharged from your jury service in this case, you are free to discuss this case with anyone . . . . However, you should be careful not to discuss your thoughts or any other juror's thought processes, in other words, why or how the jurors reached or did not reach their verdict or verdicts.

> To do so would violate the confidentiality of the jury deliberation process. If you wish to report any improper conduct by any juror or jurors during the deliberations that may have been prejudicial to either party or that may have compromised the fairness of your jury deliberations and/or verdicts, then please do so by notifying the Bailiff before you leave the courthouse.

> If at some point after you've already left the courthouse you want to contact the [c]ourt about the above concerns, please send a letter to the [c]ourt. The [c]ourt upon review of these matters may summon some or all of the jurors back to court to hold a hearing to determine whether there was any misconduct that may have been prejudicial to the parties.

> . . . .

> [T]hank you to each and every one of you for your dedicated service as jurors in this case. And at this time, you are discharged from further jury service in this matter. And the Bailiff will escort you out of the courtroom. Thank you so much.

(Emphases added.) Later that day, the court went back on the record. With the jury not present, the court stated:

> I make it a practice to go into the jury room after the trial is over to meet with jurors to thank them[.]

> . . . . And while I was doing that, statements were made that could potentially raise an issue relative to the verdict of the jury. I disclosed this to the parties and asked the parties if they desired any additional disclosure from the [c]ourt. The Plaintiff has requested further disclosure. The defense has requested or stated that the trial was over and the verdict has been made a part of the record and that the proceedings were concluded, and therefore, objects to any additional disclosure . . . .

> . . . . So I'm making this disclosure to the parties and encourage a briefing . . . as well as my own research on the issue and also attempt to preserve the status quo to the extent that that can be done to instruct the—bring the jury back, they're still here, and to simply instruct them that they're not to discuss the case with anyone or allow anyone to discuss the case with them.

> . . . .

> THE COURT: So, but I wanted to do some research on this. So, this isn't the final hearing on this.

(Emphases added.) The court explained that, to "preserve the status quo" it would "bring the jury back" because "they're still here."

The court then recalled the jury and told the jury:

> [E]arlier I gave you an instruction, and I'm going to need to rescind that, so that's the reason we had you return to the courtroom . . . . And that is I read you an instruction that began, "After you have been discharged from your jury service in this

case, you are free to discuss this case with anyone."

And I went through the balance of the instruction. I'm going to rescind that and instruct you that, at this point, you are not free to discuss this case with anyone. So I would ask that you or I'll instruct you not to discuss this case with anyone, nor allow anyone to discuss the case with you until otherwise ordered by the [c]ourt. And I apologize for giving you one instruction and now giving you the opposite instruction.

... I mean you're instructed not to discuss this case with anyone, nor allow anyone to discuss the case with you until I otherwise instruct you. All right. And I will—I won't just leave that hanging. I will give you a further instruction on this at the appropriate time. So, please keep that in mind at all times. And again, thank you very much. We'll release you at this time subject to potential recall.

(Emphases added.) The jury was then excused.

On August 7, 2009, the court conducted a "colloquy" with the jurors regarding the verdict. During the colloquy, the court read the verdict to each juror and asked the juror if the verdict accurately reflected the juror's decision. Jurors 3, 6, 11, and 12 stated that the verdict form accurately reflected their answers to the special interrogatories. Juror 4 stated that she could not remember her original answers to the verdict form. Juror 5 was the juror who had not agreed with the original verdict, and therefore stated that he voted "no" on Question 7.

Jurors 2, 7, 8, 9, and 10 stated that the answer to Question 7 was accurately recorded as "Yes," but that the jury had misinterpreted Question 7. For example, Juror 2 stated:

[JUROR 2]: When we had our discussion with [the court] and [the court] commented on the decision, that [Petitioner] wasn't within the statute of limitations, and that was not what we understood we had answered.

So somehow there was a misunderstanding with the way the question was phrased. We felt—otherwise, we wouldn't have put the figures in there, and we wouldn't have said yes to interfere—I guess you could still say yes to interference and still say it's not within the statute of limitations. But we felt there was interference and that it was within the statute of limitations but there was not conspiracy.

(Emphases added.) Similarly, Juror 8 explained that the jury "misunderstood" the question. Juror 1 simply stated that the jury's answer to Question 7 was "no instead of yes."

The court then discussed the colloquy with counsel for the parties, outside the presence of the jury. The court declined Petitioner's request to further examine the jurors and decided to allow the parties to file further motions.

On August 17, 2009, Petitioner filed a Motion to Correct Verdict and Enter Judgment, asking the court to strike "the answer 'Yes' to Verdict Form Question 7 for 'Interference with Prospective Business Expectancy,'" and to enter judgment in favor of Petitioner. On July 8, 2010, the court issued findings of fact (findings), conclusions of law (conclusions), and an order denying Petitioner's Motion to Correct Verdict and Enter Judgment. The findings and conclusions stated in pertinent part:

[Findings]

....

4. The verdict was read into the record on June 10, 2009.

5. After the verdict was read into the record, the jurors were individually polled to determine whether the verdict as read reflected their verdict. Through the polling, eleven (11) jurors responded in the affirmative, with one (1) juror responding in the negative.

6. The verdict was then made a part of the record of these proceedings.

7. The [c]ourt then discharged the jury.

8. After meeting with the jurors in order to thank them for their services, the [c]ourt informed the parties that there may be an issue concerning the verdict.

9. The jury was returned to the court-room, instructed not to discuss the case with anyone, then released subject to potential recall. The [c]ourt's instruction to the jury was intended only to preserve the status quo.

10. The [c]ourt inquired with the parties as to whether the parties would like disclosure of the statements made to the [c]ourt by the jurors.

. . . .

12. Given the Defendants' objection to disclosure, the [c]ourt did not disclose what had been said to the jury, and invited briefing as to the appropriate course of action.

13. Following review of briefing by the parties, the [c]ourt ordered that the jury return for a colloquy to take place on August 7, 2009. The colloquy was intended to develop a factual record regarding the verdict and the underlying circumstances; it was not intended as a repolling of the jury.

14. During the colloquy on August 7, 2009, certain of the jurors expressed confusion as to the legal effect of their factual response to Question 7 under the cause of action for Interference with Prospective Business Advantage on the Special Verdict Form . . . with certain of the jurors stating that they intended a different result.

. . . .

[Conclusions]

. . . .

3. Under Hawai'i case law, including [*Cabral*], this [c]ourt is not at liberty to take corrective action based upon the August 7, 2009 colloquy of the jurors.

On April 1, 2010, [Petitioner] filed a Motion to, *inter alia,* "Resubmit to Jury," seeking "an order to resubmit . . . Question No. 7 to the jury." Petitioner asserted that the question could be resubmitted to the jury because "the jury ha[d] not been discharged." On July 8, 2010, the court filed an order denying plaintiff's motion to resubmit. In the order, the court indicated that "the

jury was discharged on June 10, 2009, and remains discharged at this time." The court maintained that "the instruction that the court rescinded was an instruction that told the jury what they [sic] can and cannot do subsequent to being discharged." According to the court, it "never intended to rescind the order discharging the jury and the court's order discharging the jury has not been rescinded."

## II.

In its Application, Petitioner asks (1) whether it is the policy of the State to favor jury trials, uphold the findings of a jury, and excuse an obvious mistake, (2) whether the court and ICA erred by refusing to grant a corrected verdict when the jurors mistakenly answered a question "when the jury was still available," and (3) whether the trial court and ICA erred by failing to grant a new trial on the fiduciary duties owed by Respondents to Petitioner.

Respondents filed a Response on June 24, 2013. Petitioner filed a Reply on June 30, 2013.

## III.

Petitioner apparently incorporates its arguments on the first question with those of the second question. As to those questions, Petitioner maintains " 'it was within the court's discretion to determine that resubmitting an inconsistent verdict [ ] comport[ed] with the fair and efficient administration of justice' " (quoting *Kanahele v. Han,* 125 Hawai'i 446, 456, 263 P.3d 726, 734 (2011) (citing *Duk v. MGM Grand Hotel, Inc.,* 320 F.3d 1052, 1058 (9th Cir.2003))) and "the *Duk* case . . . resubmitted questions to correct the verdict[.]" Petitioner also cites federal cases in arguing that the colloquy between the court and the jury on August 7, 2009 is admissible to show mistake, the court is permitted to conduct jury interviews to determine what the jury intended, based upon Hawai'i Rules of Evidence (HRE) Rule 606(b)[4], and the

4. HRE Rule 606 provides in relevant part as follows:

**Rule 606 Competency of juror as witness.**

. . . .

(b) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a

court was permitted to correct the verdict in this case.[5]

## IV.

As to the first and second question the ICA held that (1) "[Petitioner] failed to show that the jury was capable of amending its verdict and [ (2) the court] did not abuse its discretion in denying the Motion to Correct Verdict and Enter Judgment because the colloquy did not establish that the jury merely made a clerical mistake when entering its verdict onto the verdict form." *Lahaina Fashions, Inc. v. Bank of Hawaii*, 129 Hawai'i 250, 258, 297 P.3d 1106, 1114 (App. 2013). The rationale of the ICA follows.

### A.

First, the ICA held that after a jury is "discharged" "the jury can no longer amend its verdict ... once the verdict is accepted by the trial court and the jury is explicitly discharged from further responsibilities in the case." *Id.* at 259, 297 P.3d at 1115 (internal citations omitted). The language of HRS § 612–22 [6] "plainly indicate[s] that an individual's responsibilities as a juror end when the trial is complete." *Id.* According to the ICA, "[t]he corollary of this is that 'after a verdict has been received and recorded and the jury

> verdict or indictment, a juror may not testify concerning the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. Nor may the juror's affidavit or evidence of any statement by the juror indicating an effect of this kind be received.
> (Emphases added).

5. According to Petitioner, in *McCullough v. Consolidated Rail Corp.*, 937 F.2d 1167 (6th Cir. 1991), the trial judge went into the jury room "to thank the jurors for their service." "The judge informed the jurors that because of the finding that plaintiff was fifty percent contributorily negligent, the $235,000 verdict would be reduced by fifty percent[.]" "The foreman and several other jurors stated that they ... intended that the net recovery would be $235,000." "[T]he judge then reconvened the jury" and "asked the foreman to explain the jury's intention." "The verdict should have read $475,000 minus 50%." "The jurors indicated this clarification in writing on the verdict form" and "the Sixth Circuit affirmed."

discharged, it can no longer function as a jury.'" *Id.* (quoting *Beglinger v. Shield*, 164 Wash. 147, 2 P.2d 681, 683 (1931)).

Therefore, whether a jury has been discharged "is linked to whether the verdict has been received and recorded." *Id.* The ICA concluded, "[a]fter a jury is discharged, it cannot amend, correct, or [thus] clarify its verdict." *Id.* "[T]he only course of action to remedy an ambiguous verdict is a new trial." *Id.* (citing *Dias v. Vanek*, 67 Haw. 114, 118, 679 P.2d 133, 136 (1984)).

However, even if the jury had not been discharged, the ICA would have held the jury was possibly influenced by unauthorized contact. *Id.* at 263, 297 P.3d at 1119 (citing *State v. Rodriguez*, 139 N.M. 450, 134 P.3d 737, 739 (2006)). The ICA contends that "the trial judge had contact with the jurors in the jury room ... at which time he discussed the legal implications of the jury's verdict with the jurors[,]" "[s]uch contact ... outside of the presence of the parties and their attorneys, would have been [ ] inappropriate had the trial been ongoing" and "'an officer of the court can constitute an improper or 'outside' influence on a juror, however innocent the officer's intent and behavior, has been established.'" *Id.* (quoting *Ex Parte T.D.M.*, 117 So.3d 933, 940 (Ala.2011)).

> Petitioner also contends that in *Attridge v. Cencorp Division of Dover Technologies, Int'l, Inc.*, 836 F.2d 113 (2d Cir.1987), "the trial judge made full disclosure of the jurors' statements to the parties." "The Second Circuit affirmed the trial court's use of juror interviews to ascertain whether the mistaken verdict that had been announced was proper" and based on "Federal Rules of Evidence Rule 606(b), the court may interview the jurors in camera as to whether the verdict ..., through mistake or inadvertence, was what the jurors intended."

6. HRS § 612–22 provides in pertinent part:

> Trial jurors subject to one year of service; one day or one trial requirement. The persons whose names are placed on the certified lists of prospective trial jurors filed by the clerk shall be subject to service for one year from and after January 1 and until the filing of new certified lists; provided that trial jurors shall serve only one day or one trial during the year.... Prospective jurors who are accepted to serve on a jury shall complete the duration of the trial and shall be dismissed from service for the year.

## B.

Second, the ICA also held that the court did not abuse its discretion in denying the Motion to Correct Verdict and Enter Judgment or the Motion to Resubmit because "HRE Rule 606(b) categorically bars individual jurors from impeaching a jury verdict based on any juror's thought process in assenting or dissenting to the verdict." [7] *Lahaina,* 129 Hawai'i at 263, 297 P.3d at 1119.

According to the ICA, in *Cabral,* 3 Haw. App. at 228, 647 P.2d at 1235, discussed in more detail *infra,* the jury returned a special verdict form that apportioned comparative negligence liability at 55% for the plaintiffs. *Lahaina,* 129 Hawai'i at 264, 297 P.3d at 1120 (citing *Cabral,* 3 Haw.App. at 224–25, 647 P.2d at 1233). The jurors were polled and all agreed the verdict was correct. *Id.* (citing *Cabral,* 3 Haw.App. at 225, 647 P.2d at 1233). "It [was] undisputed that the jury was then discharged." *Id.* (citing *Cabral,* 3 Haw.App. at 228, 647 P.2d at 1235). Subsequently, the plaintiffs filed, *inter alia,* a motion to amend the verdict, or in the alternative, for a new trial,[8] stating that the jurors had agreed that the plaintiff's liability was at 45%, not 55%. *Id.* (citing *Cabral,* 3 Haw. App. at 225–26, 647 P.2d at 1234). The motion was denied. *Id.* (citing *Cabral,* 3 Haw.App. at 226, 647 P.2d at 1234).

On appeal, the ICA held in *Cabral* that when a jury realizes, after discharge, that its answers on the special verdict form " 'caused a result opposite from what it intended, it will [not] be allowed to change … its answers so as to cause the result it intended.' " *Id.* (quoting *Cabral,* 3 Haw.App. at 228, 647 P.2d at 1234). In the instant case, the ICA decided that "[t]he overwhelming weight of the jurors' statements at the colloquy show that the jury did not merely make a clerical error, i.e., decide that the answer to question 7 was 'No' but accidentally put an 'x' next to the answer 'Yes' on the Verdict Form." *Id.* at 265, 297 P.3d at 1121. To the contrary, "[i]t

[was] abundantly clear, when considering the weight of the colloquy as a whole, that the jurors misunderstood the legal effect of their answer-that is, they thought that by answering 'Yes' to Question 7, the result would be that [Petitioner's] tortious-interference claim would not be barred by the statute of limitations[.]" *Id.* at 264–65, 297 P.3d at 1120–21 (emphasis omitted). The ICA concluded that "this type of juror confusion is not a basis for amending the verdict." *Id.* at 265, 297 P.3d at 1121.

## V.

 As an initial matter, the record demonstrates that the judge effectively rescinded his order discharging the jury. The ICA referred to the rescission issue in a footnote, relating that "the [court] stated that rescission of its instruction to the jurors that they were free to discuss with anyone [sic] did not rescind its order discharging the jury." *Lahaina,* 129 Hawai'i at 258 n. 9, 297 P.3d at 1114 n. 9. However, when the court initially discharged the jury, it read an instruction that began by informing the jury that it was free to discuss the case with anyone after it was discharged. The instruction further told the jurors that they could not discuss with others their thoughts or any other juror's thought processes, or "why and how the jurors reached or did not reach their verdict or verdicts." The court then instructed the jurors to contact the court with any concerns and thanked the jurors for their service. The instruction concluded by informing the jury that it was "discharged from further jury service in this matter."

After the court met with the jurors in the jury room, the court returned to the court room. The court informed the parties that there was "an issue relative to the verdict," and that it wanted to "preserve the status quo to the extent that can be done" by instructing the jurors "that they not …

---

7. *See supra* note 4.

8. In the instant case, the ICA noted that "[a]lthough the jury had already been discharged, had [Petitioner] presented a valid basis for impeaching the verdict, it could have been granted a new trial." *Lahaina,* 129 Hawai'i at 263, 297

P.3d at 1120 n. 14 (citing *Dias,* 67 Haw. at 118, 679 P.2d at 136 (holding that once a jury is discharged "the only available remedy [for correcting an ambiguous verdict] is a remand for a new trial")). However, "[Petitioner] never asked for one." *Id.*

discuss the case with anyone or allow anyone to discuss the case with them." The court further noted that it was possible to "bring the jury back" because "they're still here." (Emphasis added.) Thus, the jury was still present and remained subject to the court's direction and control.

The jury was then recalled to the courtroom. The court reminded the jury that "I had read you an instruction that began," "after you have been discharged from your jury service ... you are free to discuss the case with anyone. And I went through the balance of the instruction." (Emphasis added.) The court then reinstructed the jury, stating, "I'm going to rescind that, and instruct you that, at this point, you are not free to discuss this case with anyone." (Emphasis added.) The court also "apologiz[ed] for giving [the jury] one instruction and [then] giving [the jury] the opposite instruction." (Emphasis added.)

The court's discharge of the jury was included in the "balance of the instruction." The court's recession of its prior instruction thus extended to the court's discharge of the jury. By issuing the "opposite instruction," the court communicated to the jury that the "opposite" was now the case, i.e., that they were not discharged. Additionally, the court told the jury that the court "will give [the jury] a further instruction on this at the appropriate time." (Emphasis added.) It then released the jury "subject to potential recall." (Emphasis added.)

Subsequently, the court did recall the jury on August 7, 2009, and conducted a "colloquy" with individual jury members regarding the verdict. The court thus rescinded the initial instruction, including the discharge of the jury initially conveyed at the end of trial, informed the jury it was giving it an "opposite" instruction, told the jury it was subject to recall, and later recalled the jury. The record demonstrates that initially the jury did not leave the presence of the court, further instruction was given to the jury directing it not to discuss the case and to remain subject to recall, and the jury remained subject to the court's control when the court ordered the jurors back to the court to take part in a "colloquy." Although the court stated the jury had been discharged, the jury was in fact within the presence of the court and was subjected to its direction, and control. The court exercised its authority over the jury by recalling the jurors to answer questions regarding the verdict.

## VI.

The ICA stated that "our holding" is that a jury "can no longer amend its verdict following formal discharge" and a formal discharge is "acceptance and recordation of the verdict and an explicit order discharging the jury." *Lahaina Fashions, Inc.*, 129 Hawai'i at 262, 297 P.3d at 1118. The ICA's holding indicates that a jury cannot be recalled at all after discharge, even if circumstances may warrant the court's inquiry into whether the verdict represents the true intent of the jury. Respectfully, such a rule is too inflexible and does not take into account the circumstances of individual cases. *See McCullough*, 937 F.2d at 1169 ("'[P]utting verdicts beyond effective reach can only promote irregularity and injustice.'" (quoting Federal Rules of Evidence (FRE) Rule 606(b) Advisory Committee Note)).

This court has held that "[p]ermitting a jury to 'correct its own mistakes conserves judicial resources and the time and convenience of citizen jurors, as well as those of the parties,'" and "allows the case to be resolved 'according to the intent of the original factfinder, while that body is still present and able to resolve the matter.'" *Kanahele*, 125 Hawai'i at 457, 263 P.3d at 737 (quoting *Duk*, 320 F.3d at 1058). In *Kanahele*, the jury returned an inconsistent verdict by awarding the plaintiffs special damages but no general damages. 125 Hawai'i at 451, 263 P.3d at 731. Following the receipt of the verdict, the court did not discharge the jury but instead resubmitted the question to the jury with instructions that the verdict was inconsistent. *Id.* This court held that it was within the court's discretion to resolve the inconsistency in the verdict by resubmitting the verdict form to the jury. *Id.* at 457, 263 P.3d at 737.

In *Duk*, question 5 on the special verdict form stated that if the jury found the plaintiff more than 50% negligent, it should not

answer question 6, which pertained to damages. *Duk,* 320 F.3d at 1055. However, the jury found both that the plaintiff was more than 50% negligent and answered question 6. *Id.* The judge reviewed the jury form, and before announcing it, resubmitted the verdict as inconsistent. *Id.* The Ninth Circuit held that because "the jury [was] still available," the question "could be resubmitted to the jury." *Id.* at 1056.

■ Additionally, a jury may be recalled in the event that a verdict is ambiguous or improper. *See Dias,* 67 Haw. at 117, 679 P.2d at 133 ("When an ambiguous or improper verdict is returned by the jury, the court should permit the jury to correct the mistake before it is discharged."). In *Dias,* the plaintiffs, purchasers of a home, brought a fraud action against the defendant sellers based on termite damage. 67 Haw. at 116, 679 P.2d at 134. The plaintiffs sought, *inter alia,* the return of their down payment, in addition to an award of damages. *Id.* The jury awarded the plaintiffs damages but did not include the down payment in the damages amount. *Id.* It was held that the jury verdict was "ambiguous" because this court could not discern whether the jury also intended the plaintiffs to recover their down payment in addition to receiving damages. *Id.* at 118, 679 P.2d at 136. *Dias* stated that "[t]he preferred remedy of an ambiguous verdict is to have the jurors return to clarify the verdict," but because "the jury had been discharged, [ ] the only available remedy [was] a remand for a new trial." *Id.*

In the instant case, the court informed the parties that "statements were made that could potentially raise an issue relative to the verdict of the jury." By explaining to the parties that there was an "issue relative to the verdict," the court essentially informed the attorneys the verdict may have been improper, introducing into the proceedings an ambiguity as to whether the verdict essentially reflected the jury's decision *Cf. Dias,* 67 Haw. at 117, 679 P.2d at 135. Under such circumstances, the court could within its discretion recall the jury to resolve what might be perceived as an ambiguity or inconsistency in the verdict. *See Kanahele,* 125 Hawai'i at 457, 263 P.3d at 726; *Duk,* 320

F.3d at 1058; *Dias,* 67 Haw. at 118, 679 P.2d at 136.

## VII.

■ Similar considerations apply to the question of whether the court should be permitted to rescind its discharge order and conduct a colloquy with the jurors regarding the verdict. Rescinding an order of discharge may be appropriate where it allows the jury to correct its mistakes, "conserv[es] judicial resources," saves "the time and convenience" of the jurors and the parties, and "'comport[s] with the fair and efficient administration of justice.'" *Kanahele,* 125 Hawai'i at 457, 263 P.3d at 737 (quoting *Duk,* 320 F.3d at 1058).

Several jurisdictions allow the jury to amend its verdict after an express discharge where the jury is still in the presence and control of the court. *See Newport Fisherman's Supply Co., Inc. v. Derecktor,* 569 A.2d 1051, 1052–53 (R.I.1990) (holding that it was within the trial court's discretion to reconvene the jury after discharge because "the jury was for all practical purposes still within the control of the trial [court]" when the entire jury met with the trial court immediately after discharge); *Sierra Foods v. Williams,* 107 Nev. 574, 816 P.2d 466, 467 (1991) (holding that the trial court had "jurisdiction to reconvene and re-empanel the jury" after the jury had been dismissed because "the jury had not left the courthouse and remained under the *de facto* control of the court"); *Masters v. State,* 344 So.2d 616, 620–21 (Fla.Dist.Ct.App.1977) (holding that the trial court did not err in recalling the jury minutes after it was discharged because "though discharge was spoken by the court, [the jury] in fact remained an undispersed unit, within the control of the court"); *Brister v. State,* 26 Ala. 107, 132 (1855) (stating that "[t]he observation of the court to the jury, that they were discharged, was revocable by the court for a time and was revoked in due time" because "it was almost instantaneous and whilst the jury, as a body, were still continuing to be in the bar, and in the presence and power of the court" (emphasis in original)); *Summers v. United States,* 11 F.2d 583, 586 (4th Cir.1926) (holding that the

judge can recall its order discharging the jury when the jury "remains an undispersed unit, within control of the court, with no opportunity to mingle with or discuss the case with others, and [where] the very case upon which it has been impaneled is still under discussion by the court"); *Levells v. State,* 32 Ark. 585, 591 (1877) (stating that when the jurors "have not yet separated, and as a body, are still in the presence of the court, the order discharging [the jurors] is *in fieri,* and yet in the breast of the court, and may be recalled"); *Webber v. State,* 652 S.W.2d 781, 782 (Tex.Crim.App.1983) (stating that after the jury has been excused, the court may reconvene the jury to correct the verdict if "the jury has not separated or [has] only momentarily separated and [is] still in the presence of the court and it appears that no one has talked to the jurors about the case"); *State v. Fornea,* 242 La. 978, 140 So.2d 381, 383 (1962) (holding that the trial court did not err in instructing the jury to return a second verdict after the jury had been polled and discharged because the jury was still "in the presence and under the control of the court" and there was no evidence that the jury had separated or spoken to an "outsider"); *United States v. Figueroa,* 683 F.3d 69, 73 (3rd Cir.2012) (holding that the district court did not err in reconvening the jury because the district court "retained control of the jury at all times after it informed the jurors they were released" and the "jurors did not disperse and interact with any outside individuals"). Thus, the trial court may rescind its discharge order if the jury is still within the presence of, or subject to the control, or direction of the court. *See Duk,* 320 F.3d at 1057 (holding that a question can be resubmitted to the jury if the jury is still "available").

As noted before, in the instant case the jury remained within the presence, control, or direction of the court when the court rescinded its order of discharge. Based on the foregoing, it would be within the court's discretion to rescind its order discharging the jury in order to determine whether a jury's verdict was proper. *See Kanahele,* 125 Hawai'i at 457, 263 P.3d at 737 (holding that "the court did not abuse its discretion in resubmitting the damages issue to the jury,

rather than ordering a new trial[.]"). As stated in *Kanahele,* allowing jurors to amend or correct the verdict may promote the fair and efficient administration of justice by promoting judicial economy and by respecting the time and convenience of the jurors and the parties. *Id.* at 457, 263 P.3d at 737.

## VIII.

■ Respondents contended that the court's colloquy with the jury was prohibited by HRE Rule 606(b). Pursuant to HRE Rule 606(b), upon an inquiry into the validity of a verdict, a juror may not testify regarding "[his or her] mind or emotions" or the juror's "mental processes" connected to his or her assent to or dissent from the verdict. However, in the instant case the court's questions did not require the jurors to discuss their thoughts, emotions, or mental processes.

The court read the verdict to each individual juror and asked (1) whether the verdict "accurately reflect[ed] your answer to each of the questions I just read." If the answer was "no," the court then inquired of the juror (2) "what answer or answers are you referring to," (3) "what is your answer to the question or question," and (4) "when did you realize the answer to the question or questions was inaccurate." The court also asked each juror (5) whether he or she had "read, seen, or heard anything about this case," (6) to "describe what [he or she] had read," and (7) if anything that the juror had read, seen, or heard had "influenced the juror in any way in relation to any of the juror's answers to [the court's] questions." Additionally, the court instructed the jurors "to not discuss the juror's thoughts or any other juror[']s thought processes." The court further explained that jurors could not testify as to "why or how the jurors reached the verdict in this case."

The court's first three inquires asked only if the verdict "accurately reflected" each juror's verdict. Such questions did not inquire into the juror's thoughts, emotions, or mental processes connected to their assent to or dissent from the verdict or mental processes in connection therewith. Instead, they asked

only whether the announced verdict was correct. Hence, the questions regarding the accuracy of the verdict did not fall within the prohibition in HRE Rule 606(b). *See TeeVee Toons, Inc. v. MP3.Com, Inc.*, 148 F.Supp.2d 276, 278 (S.D.N.Y.2001) ("[F]ederal law distinguishes between inquiring into the jury's deliberative process, which [FRE] Rule 606(b) forbids, and merely seeking to determine whether <u>the verdict actually agreed to by the jury is the same as the verdict reported to the court,</u> which the case law permits." (emphasis added)); *cf. Plummer v. Springfield Terminal Ry. Co.*, 5 F.3d 1, 3 (1st Cir.1993) ("A number of circuits hold, and we agree, that juror testimony regarding an alleged clerical error, such as announcing a verdict different than that agreed upon, does not challenge the validity of the verdict or the deliberation or mental processes, and therefore is not subject to [FRE] Rule 606(b).").[9]

The court's fourth question referred only to the timing of the juror's realization of a discrepancy in the verdict form. This query did not refer to the validity of the verdict at all. Similarly, the court's fifth, sixth, and seventh questions were not directed to the validity of the verdict. Instead, they sought responses to whether, <u>after the trial was concluded,</u> the jurors had been subject to any improper influences.

Finally, the court's instruction to the jurors ensured that their responses stayed within the bounds of HRE Rule 606(b). The court prohibited the jurors from testifying as to their thoughts or the thoughts of any other jurors. Therefore, the court ensured that the jurors did not violate the commands of HRE Rule 606(b). The court's questions, then, did not require the jurors to reach subjects forbidden by HRE Rule 606(b).

**9.** This court has held that "[a]lthough cases interpreting provisions in the Federal Rules of Evidence are of course not binding on us, we may refer to them for their persuasive authority in interpreting similar provisions of the Hawaiʻi Rules of Evidence." *State v. Fitzwater*, 122 Hawaiʻi 354, 366, 227 P.3d 520, 532 (2010). When *TeeVee* and *Plummer* were decided, the relevant provisions of FRE Rule 606 were identical to the relevant provisions of HRE Rule 606. FRE Rule 606 (1987) provided in relevant part that:

Upon an inquiry into the validity of a verdict or indictment, <u>a juror may not testify as to any</u>

**IX.**

■ In the instant case, after the jury was discharged the bailiff escorted the jury out of the courtroom. While the jury was in the jury room the court "m[e]t with [the] jurors to thank them for their jury service." The court then returned to the courtroom to inform the parties that based on its discussion with the parties, it might be necessary to recall the jury.

Even if the jury remained in the presence and under the direction and control of the court, the ICA held that the court's conversation with the jurors constituted an improper influence that rendered the jury unable to correct or amend its verdict. *Lahaina,* 129 Hawaiʻi at 263, 297 P.3d at 1119. But the judge's conversation with the jury is not a part of the record. Respondents objected to the disclosure of anything said. Therefore, the court did not inform the parties of or place on the record what was said in its conversation with the jurors. Thus, it cannot be discerned directly whether the conversation with the jurors constituted an outside influence that precluded the court from conducting a colloquy or the jury from correcting or amending the verdict.

However, during the colloquy, nearly two months after the verdict, the testimony of some of the jurors indicated the judge's conversation with the jury may have influenced the jurors answers at the colloquy proceeding. Juror 2 testified that she realized that the verdict did not accurately reflect her answer to Question 7 after her conversation with the court. In response to a question from the court, Juror 2 stated that after "you commented on the decision, that [Petitioner]

<u>matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith,</u> except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to bear upon any juror. (Emphasis added.)

wasn't within the statute of limitations," she realized that "that was not what we understood we had answered." Similarly, in response to a question from the court, Juror 10 indicated that she recognized that he "had chosen the wrong answer to [question] number seven" after "you came and explained all those things." The juror's responses at the time of the colloquy imply that the court's conversation with the parties may have provided information to the jurors post-verdict that they had not had at the trial.

■ But, the question of whether there was some influence is moot under the circumstances of this case because, as explained *infra*, there was no valid basis for resubmitting the verdict to the jury or allowing the jury to amend its verdict as the court correctly decided.[10] Following the colloquy with the jurors it was evident that the answers to the special verdict form were not inconsistent, ambiguous, or otherwise improper. Instead, as discussed *infra*, the jurors explained that they had "misunderstood" the legal effect of their verdict. However, a verdict is not defective because the jurors misunderstand the legal effect of their answers on a special verdict form. *Cabral,* 3 Haw.App. at 228, 647 P.2d at 1235.

## X.

■ We conclude the ultimate verdict was correct and the judgment should be affirmed. As noted, for the tortious interference claim, the jury was given a special verdict form consisting of seven questions. The jury was not asked to render the ultimate verdict. Because the jury was not charged with determining the legal consequences of its answers to the interrogatories, the jurors' opinions of what result they intended by their answers is irrelevant. The legal result to be drawn from the jurors' answers is a question of law left to the court.

In this regard, *Cabral* is on point. The issue in *Cabral* was "whether [after] a jury, subsequent to its discharge, realizes that its answers to the questions on the special verdict form have caused a result opposite from what it intended, it will be allowed to change one or more of its answers so as to cause the result it intended." *Id.* at 228, 647 P.2d at 1235. To reiterate, *Cabral* held that the jury would not be allowed to amend its verdict because "[t]he fact that the jury, because of the confusion or misunderstanding of the jurors, answered the six questions in a way that caused the judge to enter an ultimate verdict opposite from the one the jurors expected him to enter is not grounds for reversal." *Id.*

In *Cabral,* a negligence case, the jury was given a special verdict form consisting of six questions. *Id.* at 224, 647 P.2d at 1233. For Question 5, as noted, the jury answered that the plaintiffs were 55% negligent and the defendant was 45% negligent. *Id.* For Question 6, the jury answered that the plaintiffs sustained $24,750.00 in damages. *Id.* at 224, 647 P.2d at 1233. The special verdict was read in court, the jury was polled, each juror affirmed that the answers to the special verdict interrogations were correct, and the jury was discharged. *Id.* at 225, 227, 647 P.2d at 1233, 1235. Because the jury found the plaintiffs more negligent than the defendant, judgment was entered in favor of the defendant. *Id.* at 224, 647 P.2d at 1233.

Subsequently, the plaintiffs filed a Motion for Judgment Notwithstanding the Special Verdict to Enter Judgment or for a New Trial. *Id.* at 225, 647 P.2d at 1234. The plaintiffs argued that the Special Verdict was inconsistent with the general intent of the jurors and that the Special Verdict form confused the jury such that the answers were different from the jury's true intent and verdict. *Id.* The plaintiffs supported their mo-

---

**10.** Of course, ordering the jury to re-enter deliberations or resubmitting a question would be problematic following any improper outside influence on the jury. *Cf. State v. Estrada,* 69 Haw. 204, 228, 738 P.2d 812, 828 (1987) ("In either a criminal or civil context, defendants are entitled to a fair and impartial jury trial free from preju-

dicial ex parte influences."); *Federcell v. Cockett,* 33 Haw. 840, 844 (Terr.1936) ("Jury trial would degenerate into a farce ... if outside influences were allowed to be brought to bear upon jurors tending to influence their verdict." (internal quotation marks omitted)).

452

tion with affidavits by eleven of the twelve jurors.[11] *Id.* at 225, 647 P.2d at 1234.

In their affidavits, the jurors indicated that the special verdict form was "confusing and misleading" and "any interpretation of [their] answer to the special verdict against the plaintiffs [was] wrong[.]" *Id.* at 226, 647 P.2d at 1234. For Question 5, the affidavits indicated the jurors did not intend for plaintiff to be 55% negligent, but instead intended for the plaintiff to be 45% negligent and receive 55% of the total damages. *Id.* In effect, the jurors sought to award the plaintiffs $24,750.00 and "tried to answer the special verdict form questions so as to cause that result, but they mistakenly answered them in such a way as to cause the opposite result." *Id.* at 228, 647 P.2d at 1235.

Similarly, in the instant case, those jurors who testified that the special verdict form did not accurately reflect their verdict essentially conveyed that they intended the tortious-interference claim to fall within the statute of limitations. Thus, they contended the question was mistakenly answered "Yes" resulting in a result opposite of what they intended. To reiterate, Question 7 for the tortious-interference claim stated:

> [Petitioner] initiated this lawsuit on June 25, 2007. Did [Respondents] meet their burden of proof by a preponderance of the evidence that [Petitioner] was either aware of its interference claim or had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the interference two or more years prior to June 25, 2007?

Juror 2 "felt [Petitioner] was within the statute of limitations" and so the "answer should have been the opposite of what [Juror 2] said[,]" and "there was a misunderstanding with the way [the special interrogatory] was phrased." Juror 7 testified that the jury had "misinterpreted" the special interrogatory because the jury "felt that the statute of

limitations was still valid[.]" Similarly, Juror 8 testified that the jury "misunderstood the question" because the jury believed the statute of limitations was still in effect. Juror 9 testified that she "answered yes only because [she] thought that [ ] the statute of limitations was still in effect" and that "if that was interpreting the question wrong," then the jury marked the "wrong block." Lastly, Juror 10 testified that after the court "came and explained all those things[,]" Juror 10 realized that the jury had "chosen the wrong answer" to the special interrogatory. Thus, there were no mistakes in the recording of the jury's answers to the special interrogatories. *Cabral,* 3 Haw.App. at 228, 647 P.2d at 1235 (citing J.F. Ghent, *Competency of Juror's Statement or Affidavit to Show that Verdict in Civil Case was not Correctly Recorded,* 18 A.L.R.3d 1132 (1968); HRE Rule 606(b)).

■ The jurors were not asked whether Petitioner's claim fell within the statute of limitations. Rather, they were asked whether Respondents had met their burden of proving that Petitioner was either aware of its claim or could have discovered its claim two years before Petitioner filed its complaint. Thus, " '[a] special verdict, as distinguished from a general verdict, is one in which the jury finds all the facts of the case and refers the decision of the cause upon those facts to the court.' " *Cabral,* 3 Haw. App. at 228, 647 P.2d at 1235 (quoting 76 Am.Jur.2d, Trial, § 1175 (1975)). Accordingly, the jury cannot take issue with the legal consequences of answers to the special interrogatories. As in *Cabral,* the fact that some members of the jury in this case realized that their answers to one of the special interrogatories effected a result different from what they intended is not grounds for reversal.[12] *Cabral,* 3 Haw.App. at 228, 647 P.2d at 1235.

---

11. The last juror could not be located, but a jury's verdict only required ten out of twelve votes. *Cabral,* 3 Haw.App. at 225, 647 P.2d at 1234 n. 1.

12. Petitioner cites *Attridge* and *McCullough* as cases that "permitted correction of the verdict based on the jury's post-verdict disclosures to the

trial judge" that were "identical to the disclosures in this case." Inasmuch as those federal cases allow the correction of a verdict based on statements that the jurors intended one of the answers to their interrogatories to have a different legal effect, they are contrary to *Cabral* and not followed.

## XI.

■ As to the third question, the ICA rejected Petitioner's argument that Respondents owed Petitioner a fiduciary duty because "[Respondents] and [Petitioner] had created a trustee-beneficiary relationship." *Lahaina Fashions*, 129 Hawai'i at 265, 297 P.3d at 1121. The ICA concluded that Wier's testimony was not "sufficient evidence to defeat JMOL" because "[w]hether a fiduciary duty exists is a question of law," *id.* (citing *Kemp v. State of Hawai'i Child Support Enforcement Agency*, 111 Hawai'i 367, 383, 141 P.3d 1014, 1030 (2006)), and "neither lay nor expert witnesses can give his or her opinion on 'matters which involve questions of law.'" *Id.* (quoting *Beal v. S. Union Gas Co.*, 66 N.M. 424, 349 P.2d 337, 346 (1960)). "Such testimony is 'without probative value and cannot raise a fact issue or support a finding of fact.'" *Id.* (quoting *Robertson Tank Lines, Inc. v. Van Cleave*, 468 S.W.2d 354, 361 (Tex.1971)). Therefore, the ICA concluded that "Weir's personal opinions concerning the legal effect of the Lease or [Respondents'] purported fiduciary relationship with [Petitioner] are conclusory statements of law, wholly devoid of probative value." *Id.* As to the issue of whether a fiduciary duty existed nonetheless, the ICA decided that "the Option is, in essence, a contract for [Respondents] to sell the property back to [Petitioner]." *Id.* However, " '[t]he relation between the vendor and purchaser is not a trust, nor is it a fiduciary relationship.'" *Id.* (quoting Third Restatement § 5 cmt. I). Therefore, the ICA concluded that "[Respondents] did not hold the Property in trust for [Petitioner]." *Id.*

## XII.

Petitioner argues in its Application that Weir's testimony and the Option demonstrated that Respondents held the Property in trust for Petitioner and Respondents therefore owed Petitioners a fiduciary duty with respect to the property. According to Petitioner, (1) the ICA overlooked the fact that the testimony of Weir and other evidence of the Option created a question of fact for the jury, (2) the ICA usurped the function of the jury, (3) the ICA overlooked *Kaho'ohanoha-*

*no v. State*, 114 Hawai'i 302, 162 P.3d 696 (2007), and (4) the ICA did not perceive the Bank's failure to object to the admission of Weir's testimony.

Petitioner argues that Wier "acknowledged and admitted" that the Option was a "clear manifestation of an intent to create a trust." Petitioner contends that in holding that Weir's testimony regarding the legal effect of Respondents' relationship with Petitioner was a conclusion of law, the ICA overlooked evidence such as the fact that Weir signed the lease agreement on behalf of the Bank as Senior Vice–President, that Weir is an attorney, and that, as an attorney, Weir cited himself in an article as the Senior Vice President of Hawaiian Trust.

In response to the ICA's decision that Respondents did not hold the property in trust for Petitioner because the Option was essentially a contract, Petitioner cites to *Kaho'ohanohano*. In *Kaho'ohanohano*, this court stated that "[t]rustees, by definition, are imbued with fiduciary duties," and defined a trustee as " 'one who holds legal title to property 'in trust' for the benefit of another person (beneficiary) and who must carry out specific duties with regard to the property.'" *Kaho'ohanohano*, 114 Hawai'i at 312, 162 P.3d at 706 (quoting *Black's Law Dictionary* 712 (6th ed. 1990)). Petitioner maintains that although the Bank held the property in fee, the Bank had specific duties with regard to the property for the benefit of Petitioner. Therefore, under *Kaho'ohanohano*, the lease agreement created a trust for the Option rights of Petitioner from which Respondents' fiduciary duties arose.

## XIII.

■ A motion for JMOL " 'may be granted only when after disregarding conflicting evidence, giving to the non-moving party's evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in the non-moving party's favor, it can be said that there is no evidence to support a jury verdict in his or her favor.'" *Miyamoto v. Lum*, 104 Hawai'i 1, 7, 84 P.3d 509, 515 (2004) (quoting *Wakabayashi v.*

*Hertz Corp.*, 66 Haw. 265, 271, 660 P.2d 1309, 1313 (1983)). Petitioner has failed to point to any evidence supporting the conclusion that a fiduciary duty existed.[13]

### A.

### 1.

First, Weir's testimony regarding the existence of a fiduciary duty did not constitute evidence sufficient to defeat a motion for JMOL. As an initial matter, Weir later clarified that the duty he was referring to was the contractual duty of good faith and fair dealing, rather than a fiduciary duty. Hence, taken in its entirety, Weir's testimony does not support that Respondents owed a fiduciary duty to Petitioner.

Additionally, Weir's testimony did not establish that Respondents had the duty to hold the property in trust for Petitioners. For a trust relationship to have been created prior to 2001, as Petitioner alleges, a manifestation of intent to impose enforceable duties would have had to been present in the lease agreement itself. Third Restatement § 13 cmt. a. However, as explained *infra*, nothing in the lease agreement constituted the manifestation of intent necessary to create a trust. Thus, irrespective of Weir's testimony, no trust was created by the lease agreement or the corresponding Option.

Finally, Weir's testimony was insufficient evidence to defeat Respondents' motion for JMOL because it constituted a legal conclusion. "Expert or non-expert opinion that amounts to a conclusion of law <u>cannot</u> be properly received in evidence, since the determination of such questions is exclusively within the province of the court." *Create 21 Chuo, Inc. v. Sw. Slopes, Inc.*, 81 Hawai'i 512, 522, 918 P.2d 1168, 1178 (App.1996) (internal quotation marks omitted) (emphasis added); *accord Pulawa v. GTE Hawaiian Tel*, 112 Hawai'i 3, 10, 143 P.3d 1205, 1212 (2006) ("Generally, '[t]he testimony of expert witnesses is ... confined to matters of fact, as distinguished from matters of law.'") (quoting *Chuo*); Addison M. Bowman, *Hawai'i Rules of Evidence Manual* § 702–3[14] (citing *Chuo* for the proposition that there can be "[n]o expert testimony about law").[14] Additionally, it has been explained that the legal conclusions of a witness "are without probative value and <u>cannot raise a fact issue</u> or support a finding of fact." *Robertson*, 468 S.W.2d at 361 (emphasis added).[15] Inasmuch as Weir's testimony regarding the existence of a fiduciary duty amounted to a legal conclusion, it could not "raise a fact issue" to defeat JMOL. *Robertson*, 468 S.W.2d at 361.

### 2.

Petitioner also maintains that the ICA did not address Weir's position as Senior Vice President and his expertise in the area of fiduciary duty. However, neither Weir's position nor his expertise alter the fact that his testimony amounted to a legal conclusion. *See Create 21*, 81 Hawai'i at 522 n. 4, 918 P.2d at 1178 n. 4; *accord* Bowman, *Hawai'i Rules of Evidence Manual* § 702–3[14].

---

13. Because the ICA correctly applied the JMOL standard, the ICA did not "usurp the functions of the jury" as Petitioner contends.

14. Hawai'i Rules of Evidence (HRE) Rule 704 is not to the contrary. Under HRE Rule 704 "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be <u>decided by the trier of fact.</u>" (Emphasis added.) However, the legal effect of the terms of the Option is not an issue to be decided by the trier of fact. Instead, it is a legal question that is "exclusively within the province of the court." *Chuo*, 81 Hawai'i at 522, 918 P.2d at 1178. Thus, HRE Rule 704 is inapposite.

15. Many other jurisdictions consider the existence of a fiduciary duty to be a question of law. *See, e.g., McGee v. Vermont Fed. Bank, FSB*, 169 Vt. 529, 726 A.2d 42, 44 (1999) ("The existence or nonexistence of a [fiduciary] duty is a question of law to be decided by the court."); *Gliko v. Permann*, 331 Mont. 112, 130 P.3d 155, 161 (2006) ("[W]hether a 'special relationship' exists between two parties such as would give rise to a fiduciary duty is a question of law, not fact[.]"); *David Welch Co. v. Erskine & Tulley*, 203 Cal. App.3d 884, 890, 250 Cal.Rptr. 339 (1988) ("With respect to a cause of action alleging breach of a fiduciary duty, the existence of the duty is a question of law."); *High Plains Genetics Research, Inc. v. J.K. Mill–Iron Ranch*, 535 N.W.2d 839, 842 (S.D.1995) ("The existence of a fiduciary duty and the scope of that duty are questions of law for the court.").

Hence, the ICA did not err by refusing to accord Weir's testimony probative force.

### 3.

*Kahoʻohanohano* is distinguishable. *Kahoʻohanohano* relied on *Honda ex rel. Kamakana v. Bd. of Trs. of the Employees' Ret. Sys.*, 108 Hawaiʻi 338, 344, 120 P.3d 237, 243 (2005) for the proposition that the Board of Trustees of the State Employee's Retirement System (ERS) owe a fiduciary duty to the retirement system and to members of the system. *Kahoʻohanohano*, 114 Hawaiʻi at 312, 162 P.3d at 706. In *Honda*, this court concluded that the ERS Board owed a fiduciary duty to the retirement system because they were "trustees" pursuant to HRS § 88–23, and "[t]rustees, by definition, are imbued with fiduciary duties." 108 Hawaiʻi at 343, 120 P.3d at 242 (internal citations omitted.) Moreover, two other sections of HRS Chapter 88 provided that the board was to "h[o]ld in trust" the retirement funds. *Id.* at 243, 120 P.3d at 242.

Here, however, Petitioner does not point to any language in the Option indicating that the relationship between Petitioner and Respondents is anything other than contractual. Further, as explained *infra*, a contractual relationship to convey property does not establish a fiduciary duty. Third Restatement § 5 cmt. I (emphasis added).

### 4.

Petitioner asserts that the ICA "overlooked" the fact that no objection was raised to Weir's testimony. To the contrary, the ICA cited *Robertson* for the proposition that the legal conclusions of a witness "cannot raise a fact issue." *Lahaina Fashions*, 129 Hawaiʻi at 265, 297 P.3d at 1121. Further, *Robertson* explained that "if such testimony is admitted, with or without objection, it has been held to be incompetent and without probative force." *Robertson*, 468 S.W.2d at 361 (emphases added). Petitioner does not distinguish *Robertson* or argue that that case does not apply. Thus, Respondents' failure to object to Weir's testimony is not dispositive of whether that testimony could defeat a motion of JMOL.

### B.

In any event, the Option itself does not impose a fiduciary duty on Respondents to hold the Property in trust for Petitioner. A trust "aris[es] from a manifestation of intention to create [a trust] and subject[s] the person who holds title to [ ] property to duties to deal with it for the benefit of ... one or more persons." Third Restatement § 2 (emphases added). Thus, "no trust is created unless the settlor manifests an intention to impose enforceable duties" with respect to property held by the trustee for the trust beneficiary. Third Restatement § 13 cmt. a (emphasis added). However, a contract that imposes only the duty to convey property to another party does not create a trust relationship with respect to the property to be conveyed. "Contracts to convey [property]" "are not trusts." Third Restatement § 5. Hence, "the relation between the vendor and the purchaser [of property] is not a trust, nor is it a fiduciary relationship." Third Restatement § 5 cmt. I (emphasis added). In sum, in order to create a trust relationship, there must be a manifestation of intent to impose legal duties other than the duty to transfer property to another. *See* Third Restatement § 13 cmt. a; Third Restatement § 5 cmt. I.

The only evidence cited by Petitioner as exhibiting a "manifestation of intent" to impose enforceable duties was the Option. Petitioner asserts the Respondents held legal title to the Property, and that the Option imposed specific duties on Respondents to deal with the Property for the benefit of Petitioner.

The Option provides that "[Petitioner] shall have the right to purchase [Respondents'] leased fee interest [in the Property]," provided that the right is exercised "for the sole purpose of selling to a third party[.]" If the Option was exercised, then Petitioner was required to pay Respondents "$6,000,000.00 plus fifty percent (50%) of the Net Proceeds of Sale in excess of ... $9,000,000.00[.]" Thus, the only effect of the Option was to grant Petitioner the right to repurchase the property from Respondents for six million dollars plus fifty percent of any sale proceeds beyond nine million dollars and sell

it to a third party. The only corresponding duty imposed on Respondents was the duty to convey the property to Petitioner if the Option was exercised. However, as explained *supra*, the imposition of such a duty does not create a trust or any other fiduciary relationship. Third Restatement § 13 cmt. a. The Option did not manifest an intention to impose any enforceable duties on Respondents with respect to the Property other than the duty to convey the Property to Petitioner if it was sold to a third party. Therefore, the Option did not create a trust.

The other terms of the lease agreement indicate that the parties did not intend to create a trust or impose any fiduciary duty on Respondents' part. According to another provision of the lease agreement, "[a]ll provisions of this Lease [including the Option] have been negotiated at arms length and with full representation of legal counsel[.]" (Emphasis added.) It has been explained that "a conventional business relationship between parties dealing at arm's length does not give rise to fiduciary duties." *Roni LLC v. Arfa*, 74 A.D.3d 442, 444, 903 N.Y.S.2d 352 (N.Y.App.2010); *accord Biller Assocs. v. Peterken*, 269 Conn. 716, 849 A.2d 847, 852 (2004) ("In the cases in which this court has, as a matter of law, refused to recognize a fiduciary relationship, the parties were [ ] dealing at arm's length[.]"); *Barrett v. Freifeld*, 64 A.D.3d 736, 739, 883 N.Y.S.2d 305 (N.Y.App.2009) (holding that a fiduciary relationship does not exist "in an arm's-length business transaction involving sophisticated business people"); *see also Godfrey v. Kidwell*, 15 Haw. 351, 355 (Terr.1903) ("The parties were not in any relation of trust or

confidence but dealt at arm's length."). "[I]f [the parties] do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion [a fiduciary] duty for them." *Ne. Gen. Corp. v. Wellington Adver., Inc.*, 82 N.Y.2d 158, 604 N.Y.S.2d 1, 624 N.E.2d 129, 131 (1993). The language of the lease agreement stating that both sides were represented by counsel plainly indicates that, had the parties intended to create a trust, they would have met the legal requirements of doing so by imposing enforceable duties on Respondents to use the Property for the benefit of Petitioner. The absence in the Option of any enforceable duties that would manifest an intention to create a trust, and in addition, the language of the lease agreement stating that this was an arms length business transaction, preclude the imposition of a trust duty.[16]

### XIV.

Petitioner also contends that "the ICA committed grave error by ignoring the evidence regarding the Bank's intent to block the Option from being exercised" inasmuch as "[t]he statute of limitations d[id] not begin to run on [Petitioner's] claims under the 'last overt act' on February 18, 2009."[17] Therefore, Petitioner concludes that "[Respondents] have no plausible statute of limitations defense."

However, the ICA did not decide when the statute of limitations began to run on Petitioner's claims. On cross-appeal, Respondents asserted that the court erred in denying their motion for JMOL as to Petitioner's first cause of action because the court should

---

**16.** At oral argument, the question was raised of whether the lease agreement or Option created another fiduciary relationship, such as a partnership or joint venture. Petitioner has never asserted that the lease agreement or Option created a partnership or joint venture. The lease agreement itself stated that "[Petitioner] and [the Bank] hereby agree that [the Bank] in no event and for no purpose is a partner of [Petitioner] in the conduct of any of its businesses or other affairs or a joint venturer or member of a joint enterprise with [Petitioner]." (Emphasis added.) Thus, the lease agreement plainly evinces the intent of the parties that the lease agreement, including the Option, did not constitute a partnership or joint venture.

At oral argument, Restatement (Second) of Torts § 874 (1979) (Section 874) was also dis-

cussed. Section 874 provides that "one standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation." Thus, the existence of a fiduciary duty is a prerequisite for the application of section 874. Inasmuch as no fiduciary duty existed here, *see* discussion *supra*, Section 874 is inapplicable.

**17.** Before the ICA, Petitioner's Answering Brief to Respondents' cross-appeal contended that the Bank concealed its fraud until "the deposition of [Mr.] Ferguson–Brey on February 18, 2009." Petitioner maintained that the statute of limitations did not begin to run on its claims until that date.

have concluded as a matter of law that the statute of limitations had expired. But, in light of its decision that the jury could not impeach its verdict, the ICA held that "Respondents' cross-appeal is moot." *Lahaina Fashions*, 129 Hawai'i at 267, 297 P.3d at 1123. Petitioners did not appeal from an adverse ICA decision on this issue, therefore this issue is not addressed further. Additionally, if Petitioner's Application is construed as asserting that the ICA should have held that Respondents had no plausible statute of limitations defense as a matter of law, Petitioner waived this issue by not raising it before the ICA. *See* HRAP Rule 28 (requiring Appellants to set forth the points of error in their Opening Brief and providing that "[p]oints not presented in accordance with this section will be disregarded").

### XV.

Based on the foregoing, the April 12, 2013 judgment of the ICA filed pursuant to its February 2, 2013 published opinion is affirmed in part and vacated in part for the reasons set forth herein, but the July 8, 2010 final judgment of the court is affirmed.